**UNITED STATES of America, Appellee,**

v.

**Michael TRACY and Francisco Luis Aguilar, Defendants–Appellants.**

**Nos. 122, 123, Dockets 92–1313, 92–1375.**

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1993.

Decided Dec. 23, 1993.

James I. Glasser, Asst. U.S. Atty., Bridgeport, CT (Albert S. Dabrowski, U.S. Atty., D.Conn., New Haven, CT, Michael E. Ru-

nowicz, Asst. U.S. Atty., Bridgeport, CT, on the brief), for appellee.

Robert C.E. Lainey, Westport, CT (Stanley P. Atwood, Sherwood, Garlick, Cowell, Diviney & Atwood, on the brief), for defendant-appellant Michael Tracy.

Colleen P. Cassidy, New York City (The Legal Aid Society, Federal Defender Services Unit, on the brief), for defendant-appellant Francisco Luis Aguilar.

Before KEARSE and WINTER, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Defendants Michael Tracy and Francisco Luis Aguilar appeal from judgments entered in the United States District Court for the District of Connecticut following a jury trial before Warren W. Eginton, *Judge,* convicting them of conspiracy to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846 (1988), and convicting Aguilar on five counts of distribution of and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988), one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of continuing criminal enterprise, in violation of 21 U.S.C. § 848 (1988). Tracy was sentenced principally to 327 months' imprisonment, to be served consecutively to a term of imprisonment imposed on him in 1991 on related charges, and to be followed by a five-year term of supervised release. Aguilar was sentenced principally to 480 months' imprisonment, to be followed by a four-year term of supervised release. Aguilar contends principally that he was deprived of his Sixth Amendment right to counsel, that his conviction should be reversed for various trial errors, and that the court erred in computing his sentence. Tracy principally challenges various aspects of his sentence. For the reasons below, we conclude that the court applied the wrong Guidelines section in considering whether Tracy's sentence should be consecutive to his prior sentence, and we

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New      York, sitting by designation.

vacate the judgment as to Tracy and remand for resentencing. In all other respects, we affirm.

## I. BACKGROUND

The current prosecution arose out of an investigation begun by the United States Drug Enforcement Administration ("DEA") in Florida in June 1989 and continued in Connecticut with the assistance of the Federal Bureau of Investigation and local law enforcement agents until 1991. Evidence of the events was presented at trial principally through (a) testimony of surveillance agents and agents to whom, in their undercover roles, Aguilar sold cocaine, (b) tape recordings of conversations in which Aguilar or his associates discussed the distribution of cocaine, (c) physical evidence including cocaine, drug paraphernalia, a large array of weapons, and voluminous drug records, and (d) testimony of two coconspirators who, after being arrested, pleaded guilty and entered into cooperation agreements with the government.

### A. The Events

Taken in the light most favorable to the government, the evidence, whose sufficiency is not disputed, showed that Aguilar was the leader of a narcotics organization that he aptly described as a factory-size operation. See Part II.B.2. below. During the course of the investigation, Aguilar negotiated to have undercover agents sell him, or import for him, hundreds of kilograms of cocaine. He told agents he was looking for a source that could provide him with 100 kilograms a week. Aguilar himself negotiated several sales of cocaine and distributed cocaine to other undercover agents. Tracy was the organization's chief enforcer, responsible for its security and for collecting debts owed to it.

Aguilar and seven other members of his organization, not including Tracy, were arrested on October 25, 1990, pursuant to an October 24, 1990 Complaint supported by a 45–page affidavit (collectively the "Complaint") detailing the offenses with which they were to be charged and evidence supporting the charges. They and Tracy were eventually named in a superseding indictment handed down in January 1991. Aguilar was charged with the eight counts of narcotics violations indicated above; Tracy was charged with one count of narcotics conspiracy as indicated above.

Tracy was arrested on February 1, 1991. In executing a search warrant for Tracy's home in January 1991, agents found a loaded .44 caliber Magnum revolver, ammunition for .44 and .38 caliber weapons, and a copy of the Complaint, with annotations on ten of its pages in handwriting later stipulated to be that of Tracy. The notations identified informants who were referred to in the Complaint only in code and promised death to the informants and to DEA Special Agent Terrence Sprankle who had signed the Complaint. For example, on the first page of the document, Tracy had written, "all informants will die a bad death [expletive] snitches before I die I will kill all your [sic] lousy [expletive] scum." Under a reference to an informant to whom the Complaint referred only as "CI#1," Tracy had written, "I know you you will get it the worst put in a barrel of acid scum [expletive] put in acid real slow you lousy bastard." Next to another reference to CI#1, Tracy had written, "Snitch # 5 Shorty. Dead real slow stabbed 50 times cut throat put on fire I will do this." Under Sprankle's signature on the Complaint, Tracy had written, "you must go also cop your family too." For this threat to Sprankle and his family, Tracy was convicted, under a separate indictment, on two counts of threatening a law enforcement officer and his family, respectively, in violation of 18 U.S.C. § 115(a)(1) (1988), and was sentenced in May 1991 to two consecutive five-year terms of imprisonment (the "1991 sentence").

Of the nine individuals named as defendants in the superseding indictment in the present case, seven entered pleas of guilty. Tracy and Aguilar went to trial.

### B. The Proceedings Below

As discussed in Part II.A. below, prior to trial Aguilar informed the district court that he was dissatisfied with the services of his attorney Howard Eckenrode and moved to represent himself for purposes of the sup-

pression hearing or to have a "hybrid" representation. The court, after advising Aguilar against proceeding *pro se*, warning him of the dangers of doing so, and conducting an inquiry as to Aguilar's awareness of his rights and the vulnerability of those rights during self-representation, allowed Aguilar to proceed *pro se* and appointed Eckenrode as stand-by counsel to provide advice upon Aguilar's request. Largely on the basis of these earlier proceedings, the court also permitted Aguilar to represent himself at trial.

After a five-week trial, the jury found both defendants guilty of all charges against them. The Probation Department's presentence reports ("PSRs") prepared on Tracy and Aguilar concluded that the imprisonment ranges prescribed by the federal Sentencing Guidelines ("Guidelines") were 324–405 months for Tracy and 360 months to life for Aguilar. After evidentiary hearings as to each defendant, the district court agreed with these recommendations. Finding Aguilar responsible for conspiring to distribute 50–150 kilograms of cocaine, the court sentenced him to 480 months' imprisonment, stating that it had chosen that sentence principally because of the size and sophistication of the drug organization, Aguilar's decision-making role, the violent aspects of the organization, and Aguilar's persistent denial of any role in the operation. The court overruled Tracy's objections to various aspects of his PSR, *see* Part II.E.2 below, and sentenced him to 327 months' imprisonment. As discussed in Part II.E.3. below, the court ordered Tracy to serve the present sentence consecutively to his 1991 sentence.

These appeals followed.

## II. DISCUSSION

On appeal, Aguilar contends principally (1) that he was deprived of his Sixth Amendment right to the effective assistance of counsel when the district court allowed him to proceed *pro se* at trial, and (2) that the court erred in admitting the Tracy threats into evidence against him and in making certain comments to the jury. He also challenges his sentence. Tracy's principal challenges are to his sentence; he also contends that the document bearing his threats should not have

been admitted in evidence against him because it was unduly prejudicial, and that he should have been tried separately from Aguilar because of the latter's *pro se* status. Except with respect to Tracy's challenge to the imposition of his sentence consecutively to his 1991 sentence, we find no basis for disturbing the judgments.

### A. *Aguilar's Representation of Himself at Trial*

■ Aguilar contends that the district court, although properly allowing him to represent himself at the pretrial stage, should not have allowed him to represent himself at trial. He contends that the court's inquiry into his ability to make the latter choice was inadequate and that his self-representation was extremely prejudicial. Though the court's inquiry could have been more extensive, we conclude that it was adequate; given that adequacy, the fact that Aguilar's choice proved to be imprudent is not a basis for relief from the judgment.

■ The Sixth Amendment guarantees the accused in a criminal prosecution the right to counsel. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). The defendant also has a right under the Sixth Amendment to defend himself without the assistance of counsel if that decision is made intelligently and knowingly, with full awareness of the right to counsel and the consequences of its waiver. *Faretta v. California*, 422 U.S. 806, 835–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). If the defendant has represented himself after such a knowing and intelligent decision, he has not been denied his Sixth Amendment right to counsel. *Faretta v. California*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2540 n. 46.

■ The determination of whether a defendant's election is knowing and intelligent depends on the particular facts and circumstances of the case, "'including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. at 482, 101 S.Ct. at 1883 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023,

82 L.Ed. 1461 (1938)). A defendant electing to proceed *pro se* need not have all the understanding and skill of a lawyer, *see Faretta,* 422 U.S. at 835–36, 95 S.Ct. at 2541 (absence of "technical legal knowledge, as such, [i]s not relevant to an assessment of [the defendant's] knowing exercise of the right to defend himself"), so long as he has the capacity for making a rational decision and has been "made aware of the dangers and disadvantages of self-representation," *id.* at 835, 95 S.Ct. at 2541; *see also United States v. Purnett,* 910 F.2d 51, 54–55 (2d Cir.1990). The court should strive for a " 'full and calm discussion' " with the defendant in order to satisfy itself that he has the requisite capacity to understand and sufficient knowledge to make a rational choice. *United States v. Tompkins,* 623 F.2d 824, 828 (2d Cir.1980) (quoting *United States v. Spencer,* 439 F.2d 1047, 1050 (2d Cir.1971)). We conclude that the district court's allowing Aguilar to represent himself was consistent with these principles.

Aguilar's motion seeking permission to proceed *pro se* was filed six months prior to trial and cited *Faretta* and 28 U.S.C. § 1654 (1988) ("In all courts of the United States the parties may plead and conduct their own cases personally . . . ."). Aguilar pressed that motion at a pretrial suppression hearing on October 25, 1991:

> THE COURT: . . . .
> All right, Mr. Aguilar, you said you wanted to address the Court, so go right ahead.
> MR. AGUILAR: With your permission, Your Honor, I, Francisco Luis Aguilar, American citizen, veteran U.S. Navy, Your Honor, I would like to defend myself but, Your Honor, at the same time I would like to review [*sic*] my motion of hybrid defense.
> . . . .
> MR. AGUILAR: . . . . With your permission, Your Honor, I would like to act as pro se. And with the review of my motion on the hybrid defense, if that is granted, I will have an attorney with me; if no, I will be acting as pro se, meaning for myself.

(Suppression Hearing Transcript, October 25, 1991, at 5–6.) The court advised Aguilar of its view that proceeding *pro se* in a criminal case was imprudent. It proceeded to explain to Aguilar, *inter alia,* that the government had the obligation to prove his guilt beyond a reasonable doubt, that a defendant has no obligation to put on any evidence at all, that he is not obligated to testify, that the jury will be instructed that his silence cannot be used against him, and that these rights are undermined when a defendant proceeds *pro se:*

> Now, the problem with that in a pro se representation case is that it is undermined, the privilege is undermined by the exposure to the jury and the jury, regardless of how the judge charges that jury, it's a highly hazardous procedure because the jury is going to draw impressions of the defendant as the defendant conducts himself in the role of attorney in the trial.

(*Id.* 8.) Aguilar stated that he wanted to make clear that his request was "not a strategic ploy of a defendant hoping to create grounds for appellate reversal of an almost certain conviction." (*Id.* 10.) He informed the court that he had represented himself in an appeal in the state court. The court pointed out that Aguilar had not been happy with the result in that case and should learn from that failure. Aguilar also informed the court that he had studied the law during his year of pretrial detention on the present charges.

After having Assistant United States Attorney ("AUSA") Glasser read the terms of the indictment to Aguilar, the court pointed out that Aguilar was charged with continuing criminal enterprise, which exposed him to a possible sentence of life imprisonment, and that this exposure was itself a consideration sufficient to indicate the importance of choosing to have counsel represent him. The court also pointed out that Aguilar was being tried with a codefendant, which would further complicate his problems in representing himself, that the court would not be able to give him any advice as to how to try the case, and that Aguilar would have to be prepared to follow the Federal Rules of Evidence.

At that point, Aguilar informed the court that he was not moving to represent himself

at trial but merely wanted to represent himself at the suppression hearing, "because if I can prove what I'm trying to prove, I will get it dismissed." (*Id.* 40.) The court said its only remaining question was whether Aguilar realized that if he took the witness stand he would be required to ask himself questions, a process always fraught with peril at trial though less so at a pretrial hearing. After warning Aguilar further about the dangers of proceeding *pro se* at even the pretrial stage, the court granted Aguilar's motion to represent himself at the pretrial stage. The court appointed Eckenrode to act as stand-by counsel.

On November 18, 1991, after jury selection was complete, Aguilar announced that he also wished to represent himself at trial. Although the court's recollection was that a complete allocution with respect to self-representation had been conducted at the suppression hearing, the court addressed Aguilar again "out of an excess of caution." The court again informed Aguilar that

[i]t is very dangerous to your health and welfare to proceed *pro se* in a criminal case. The criminal law is very complex. It is not easy to understand and there are certain things that have to be done in a proper and timely fashion in defending yourself in a criminal case. So if you're going to proceed pro se, you've got to realize the jury will look at you not only in your guise as a witness, if indeed the time does come that you testify, but in your guise as an attorney conducting your own case.

Now, that particularly implicates the fifth amendment because the ordinary criminal defendant is not exposed to the jury at all during the government's case. The government has to prove his guilt beyond a reasonable doubt on the strength of the government's own evidence and the jury never zeros in on the defendant in a criminal case at all until the government has rested its case.... So that sort of goes out the window when you act as your own attorney and ask questions of government witnesses in the government case. And that's the first thing you've got to realize that that's going to be involved.

Secondly, you may fail to do things that ought to be done, and you may do things that ought not to be done during the course of the criminal trial which will prejudice your right to a fair trial. And you would be prejudicing that right yourself so that you would not have any basis to object to any impact that might have on an otherwise fair trial.

(Trial Transcript, November 18, 1991 ("Nov. 18 Tr."), 11–13.) Aguilar then stated that he viewed Eckenrode as a "threat to [his] freedom and incrimination [*sic*] and to [his] sixth amendment of the trial [*sic*] because what he's trying to pursue on me, what he's trying to push on me is a denial of these rights. So my meaning is what other choice do I have, Your Honor? If I no just proceed pro se, the only choice that I have is Mr. Eckenrode." (*Id.* 13.) When pressed for details, Aguilar stated that Eckenrode had urged him to enter a plea bargain, but that Aguilar did not want to plead guilty because he did not want to give up his Fifth and Sixth Amendment and due process rights. (*Id.* 17.) The court noted that, Aguilar having been given an opportunity months earlier to change attorneys and having declined, it was too late for Aguilar to substitute new counsel. Aguilar expressed some trepidation at proceeding *pro se,* and the court advised him that his choices were to continue with Eckenrode, to represent himself, or to represent himself with Eckenrode standing by to respond to requests for advice. (*Id.* 17–18.)

The AUSA suggested that

[i]f Mr. Aguilar indeed is going to go pro se, I would urge the court—I know the court made the inquiry once before in the preliminary stage, I know in an excess of caution, and perhaps the court should inquire of Mr. Aguilar the questions suggested by the [*Faretta*] decision of the Supreme [C]ourt, that is, if he understands the disadvantages. I know Your Honor has—

THE COURT: I just did that.

MR. GLASSER: But also the charges he faces, the penalties he faces and the fact that he's not to be allowed to proceed in this trial pro se to the detriment of his ... co-defendant, that is Mr. Tracy, and that

he must comply with the rules of this court and the rules of evidence and won't be permitted to testify when he's questioning but must put a proper question to the witness and must conduct and will comport himself with the rules of the court.

THE COURT: Well, I think that you've said it. I've said it to him a couple of times. You recall what he's facing, as I recall it without having it right in front of me, was something like life several times and many millions of dollars in fines, but what was critical, of course, was the life incarcerations that he faces, especially when you look at count eleven which is a continuing conspiracy, continuing criminal enterprise count, so he faces life several times over. And that's why it's a serious case.

(Nov. 18 Tr. 20–21.)

Thus, the district court twice advised Aguilar, in the space of some three weeks, of the dangers of proceeding *pro se*. It would have been better for the court to repeat all of its earlier advice in the context of the request made at the start of trial; the court certainly could also have questioned Aguilar more directly as to his understanding of the rights he would give up by representing himself; and it should have ensured that Aguilar's responses were reflected in the record. Nonetheless, the recommended procedures are not talismanic. The record indicates that Aguilar understood his rights and was capable of making a knowing and intelligent decision to represent himself. Indeed, he was sufficiently familiar with the intricacies of the law governing the rights of counsel and of self-representation to volunteer to the court that his motion to proceed *pro se* was not merely a "strategic ploy" to gain reversal on appeal.

It is true that Aguilar expressed some apprehensiveness about proceeding *pro se;* but he went on to state unequivocally that he would rather follow that course than have Eckenrode represent him. To the extent that any of Aguilar's statements amounted to a request for new counsel, the court plainly acted within the proper bounds of discretion in denying such a request, given Aguilar's delay in requesting that relief until a jury had been selected. We conclude that the court's granting of Aguilar's motion to represent himself did not violate his Sixth Amendment right to counsel.

Finally, we note that Tracy contends that in light of Aguilar's self-representation, Tracy was entitled to be tried separately. This contention need not detain us long.

██ First, Tracy made no complaint about being tried with Aguilar until the sentencing stage of the case. Any severance claim was thus waived. Further, in order to prevail on appeal even as to a properly preserved severance claim, a defendant must show that the denial of his motion constituted an abuse of discretion, *see, e.g., Zafiro v. United States*, ── U.S. ──, ──, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), and caused him prejudice so substantial that his conviction constituted a miscarriage of justice, *see, e.g., United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir.1993); *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir. 1992); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

██ Tracy has made no such showing here. The mere fact that a codefendant is proceeding *pro se* is not in itself a ground for severance. Further, though Aguilar's performance at trial may have resulted in the introduction of evidence that would not have been offered had Aguilar been represented by counsel, most of that evidence was not inadmissible against Tracy and thus cannot be said to have deprived him of a fair trial. It may be that the testimony of one attorney witness called by Aguilar, to the effect that the attorney might have represented Tracy in connection with a 1983 criminal matter, was not admissible against Tracy at the present trial. However, the effect of that testimony could only have been slight in light of the evidence against him, *see* Parts II.B.1., II.B.2, and II.E.2. below, which was plainly overwhelming. We conclude that Tracy's severance contention is meritless.

### B. Admission of the Complaint Bearing Tracy's Threats

The government offered into evidence against Tracy a copy of the Complaint, as annotated with his threats of death to informants and law enforcement agents (the "Tracy-threat annotations"), for the purposes of showing his membership in and familiarity with the conspiracy and his consciousness of guilt. The court required that the document be redacted to conceal the government's allegations and admitted it, as redacted, over defendants' objections. The court initially admitted the document only against Tracy, but arguably eventually allowed it to be considered against Aguilar as well. On appeal, both defendants contend that the Tracy-threat annotations should have been excluded pursuant to Fed.R.Evid. 403 on the ground that their potential for unfair prejudice far outweighed their probative value. Aguilar, more fundamentally, argues that the document was not relevant evidence admissible against him on any theory. We find no merit in Tracy's challenge to the admission of the document against him. And while we agree that the Tracy-threat annotations should not have been admitted against Aguilar, we conclude, in all the circumstances, that the error in admitting that evidence against him does not warrant reversal.

#### 1. Admissibility Against Tracy

■ Rule 403 gives the trial judge discretion to exclude relevant evidence on the ground that its potential for unfair prejudice substantially outweighs its probative value. See Fed.R.Evid. 403. We will overturn a trial judge's determination under Rule 403 only if we determine that the judge acted arbitrarily or irrationally. See, e.g., United States v. Jamil, 707 F.2d 638, 642 (2d Cir. 1983). Evidence of threats of death is subjected to the same Rule 403 balancing test as other relevant evidence, United States v. Qamar, 671 F.2d 732, 736 (2d Cir.1982), though the stakes may be heightened, for evidence of death threats may be extremely probative when the threats were directed against a witness, see, e.g., United States v. De Lillo, 620 F.2d 939, 946 (2d Cir.), cert. denied, 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980), and the potential for inflaming the jury may be great, see, e.g., United States v. Qamar, 671 F.2d at 736.

■ If the trial court determines that the probative value of the death threat outweighs its potential for unfair prejudice, the defendant against whom it is admissible may request a limiting instruction to the jury, cautioning it not to consider the threat as proof of the defendant's violent character, but only as proof of such matters as the defendant's membership in the conspiracy or consciousness of guilt. Id.; see Fed.R.Evid. 105. If the defendant does not make such a request, the trial judge's failure to give such an instruction is a ground for reversal only if it constitutes an error that is "egregious and obvious" and if reversal is "necessary to redress a miscarriage of justice." United States v. Tillem, 906 F.2d 814, 825 (2d Cir. 1990); see United States v. Katz, 601 F.2d 66, 67 (2d Cir.1979) (per curiam).

■ We find no error or abuse of discretion with respect to Tracy. The evidence was offered by the government against Tracy to prove, inter alia, that he was a member of the conspiracy and played a role that gave him sufficient familiarity with the operation to enable him to identify the unnamed persons who could have provided the information reflected in the Complaint. His threatening notations on 10 pages of the Complaint were plainly relevant for those purposes and to confirm the testimony of the cooperating codefendants that Tracy's role in the operation was that of enforcer. The trial court properly performed the balancing analysis, recognizing the potentially inflammatory nature of the evidence, and seeking to eliminate any undue prejudice by having the Complaint redacted to conceal the official allegations made in that document.

Though Tracy sought to have the document excluded entirely, he did not request a limiting instruction. We cannot conclude that appellate relief is needed here to redress any miscarriage of justice since, as Tracy's attorney stated in trying to have the document excluded entirely, "the government ha[d] enough to convict Mr. Tracy without this."

### 2. *Admissibility Against Aguilar*

■ The issue with respect to Aguilar is somewhat different. He objected to the admission of the Complaint principally on the ground that the threats were not made in furtherance of the conspiracy and hence were inadmissible hearsay as to him. We agree that the Tracy-threat annotations were not admissible against Aguilar.

■ Fed.R.Evid. 801(d)(2)(E) classifies as nonhearsay a statement of a coconspirator in furtherance of the conspiracy. In order to admit a statement under this Rule, the court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *see also United States v. Mastropieri*, 685 F.2d 776, 786 (2d Cir.1982) (declarations of one member of a conspiracy are admissible against another member "only if made 'during the course of and in furtherance of the conspiracy'" (quoting Rule)). As the "in furtherance" term implies, the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy, *see, e.g., United States v. Rahme*, 813 F.2d 31, 35–36 (2d Cir.1987); *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity, *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Mere "idle chatter" does not satisfy the in-furtherance requirement. *United States v. Paone*, 782 F.2d 386, 390 (2d Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986).

We are not aware of any evidence in the record that would have permitted a finding that Tracy's threats were made during or in furtherance of the conspiracy. Our attention has not been called to any evidence that the threats were communicated to any of their targets, or that assurances of coercive or retributive actions were communicated to any other member of the conspiracy, or that any member of the conspiracy was even aware of the annotations. Indeed, it seems unlikely that the notations were made while the conspiracy with which Aguilar was charged was still in existence. First, the notations were made on the Complaint, which was not issued until October 24, 1991, just one day before Aguilar and the seven codefendants other than Tracy were arrested; and there was no showing that the conspiracy that included Aguilar endured beyond those arrests. Second, the annotated document was not discovered until January 1992, just prior to Tracy's own arrest. It hardly seems likely that the Complaint would have been available to Tracy before his codefendants were arrested; nor is it likely that the threatening notes were made on it in the one day between its issuance and those earlier arrests rather than in the remainder of the three months between its issuance and the eventual arrest of Tracy.

It was undoubtedly for these sound reasons that the government did not offer the Tracy-threat annotations against Aguilar and urged the court to advise the jury that the document could not be considered against him at all. The court's response, however, was ambiguous. The instructions and colloquy were as follows:

> [The Tracy-threat document] in no way can be binding on Mr. Aguilar because it was not done in his presence as far as we know. We have no evidence it was done in his presence. We have no evidence that he knew anything about it, so that it can't be binding on him.
>
> Now, *there may come a time in the case, as I've told you many times, when I will give you what is called a connection instruction and then you may consider the*

*evidence against anybody involved in the conspiracy.* But *unless and until* that time comes, you must give this separate consideration. Concentrate on Mr. Tracy on this one, not on Mr. Aguilar.

MR. GLASSER: Your Honor, may I ask the court also to instruct the jury that for practical purposes that this particular piece of evidence shouldn't be considered against Mr. Aguilar at all. It should just be considered with respect to Mr. Tracy.

THE COURT: That's what I tried to tell you. He's stated it more directly than I did but you got the message. All right.

(Trial Transcript, December 10, 1991 ("Dec. 10 Tr."), at 15–16 (emphasis added).)

The content of that message is not clear to us, for the AUSA's statement that the evidence should not be considered against Aguilar "at all" was not the same as the court's statement that the evidence might be considered against him eventually. We cannot determine from this colloquy whether the court thought that the AUSA meant that the jury should not consider the document against Aguilar at all unless connecting proof were forthcoming—which was the unmistakable meaning of the court's own words—or whether the court meant to modify its own instruction in order to tell the jury that it could not consider that evidence against Aguilar at all, regardless of any connecting evidence. The latter interpretation seems unlikely, given the court's apparent view that the AUSA had merely "more directly" restated the court's instruction. Further, a later instruction to the jury plainly indicated that the jury was allowed to consider the Tracy-threat annotations against Aguilar. At the close of the evidence, the court stated as follows:

THE COURT: . . . .

. . . [Y]ou will have heard me say many times throughout the early part of the trial, although I did not bother to refer to it later on, that evidence that was received as to the words or actions of a particular defendant, such as Mr. Aguilar, could not be credited against Mr. Tracy and vi[ce] versa. And I told you that there might come a time when I would give you a connection type instruction.

. . . .

. . . I will charge you at this time that you have received certain evidence in this case, evidence that Mr. Aguilar said or did something, or Mr. Tracy said or did something, or somebody you heard mentioned as a co-conspirator, in the role of a co-conspirator said or did something outside the presence of either or both of these defendants. Mr. Aguilar may have said or done something outside the presence of Mr. Tracy. *Mr. Tracy may have said or done something outside the presence of Mr. Aguilar. I had told you that you could not consider those except as against the individual involved in them. I'm now charging you that those acts and statements of any other individuals, whether it's one of these defendants or a co-conspirator, may be considered by you in determining whether or not the government has proven the charges in the indictment against each of these defendants.*

. . . . *[Y]ou may consider all of the evidence against these defendants.*

(Trial Transcript, December 20, 1991 ("Dec. 20 Tr."), at 47–49 (emphasis added).)

Aguilar contends that this instruction allowed the jury to consider the Tracy-threat evidence against him, and we are inclined to agree. The passages that told the jury it could consider Tracy's statements against Aguilar and could consider all of the evidence against each defendant did not make any discernable exception for the Tracy-threat annotations. This was consistent with the court's initial cautionary instruction with respect to the annotations, which told the jury not to consider them as evidence against Aguilar "unless and until" the court gave a "connection instruction," following which the jury could "consider the evidence against anybody involved in the case." (Dec. 10 Tr. 15.) Viewing the instructions in their entirety, we doubt that the jury would have understood the court's terse ostensible agreement with the AUSA as overruling all of the court's fully explicated instructions that preceded and followed. We conclude that the jury would have inferred from all the court said that the jury could indeed consider the Tracy threats in assessing the charges against Aguilar.

Nonetheless, we are not persuaded that the evidence of the Tracy-threat annotations had any effect on the jury's consideration of the charges against Aguilar. The indictment charged Aguilar with possessing and distributing cocaine on or about five dates in 1990, to wit, January 24, January 30, February 28, June 15, and July 16, and with possessing cocaine with intent to distribute on October 25, 1990. It charged that from approximately June 1989 through October 25, 1990, he engaged in a continuing criminal enterprise and conspired with Tracy, Arnold Aguilar, Alberto Boero, Crucita Sanchez, Carmen Cotto, and Elvis Morales, *inter alios,* to distribute cocaine. The government's evidence in support of these charges was overwhelming. It included testimony of law enforcement agents as to face-to-face meetings with Aguilar, consensually monitored and tape-recorded telephone conversations, and the testimony of Boero and Sanchez. The evidence showed the following.

In June 1989, Aguilar, whose ostensible business was running a fruit store, bought 21 beepers, including an alpha-numeric pager; thereafter, he spent nearly $25,000 in cash on beeper-related expenses. On June 27, shortly after his purchase of the beepers, Aguilar went to Miami, where he and Boero met with two DEA agents who were posing as cocaine smugglers. Aguilar asked the agents if they could sell him 30–50 kilograms of cocaine immediately; he told them he was also looking for a reliable source that could supply his organization with 100 kilograms of cocaine a week. He gave the undercover agents his beeper number, a number that was used to page him throughout the ensuing investigation. On July 10, the agents met with Aguilar, at his instigation, and discussed Aguilar's hope to import 400 kilograms of cocaine from Colombia.

At various times during the investigation, Aguilar described his drug dealing enterprise as "like a factory," a high-volume, low-priced operation. He said he could get cocaine anytime and could offer discounted prices for purchases of quantities in excess of 10 kilograms. He said his costs of operation included bail money and money to pay lawyers; he also claimed to have on his payroll a high-ranking Mexican official and local officials.

Boero, whose association with Aguilar dated back to 1983, worked from mid–1990 in the organization's "office" to institute controls over its cash receipts. At trial, Boero identified various books and records, seized incident to his arrest, as the drug records of Aguilar's organization. He testified that the organization had cash receipts totaling $10,000 to $15,000 a day. It had more than 20 employees on its payroll and expended more than $21,000 a week in salaries. Boero testified that Aguilar's salary, the highest, was $1,800 to $2,500 a week.

Sanchez testified that she began working for Aguilar as a runner in 1989. She would meet Aguilar or Tracy at various spots along a highway, and they would give her one-kilogram or half-kilogram packages of cocaine to deliver to customers. After delivering the cocaine, she would give the money she collected to either Aguilar or Tracy. Sanchez estimated that she personally delivered a minimum of $7,000 worth of cocaine daily.

On January 24, 1990, Aguilar had telephone conversations with Jose Segovia, one of his customers who was cooperating with the authorities; eventually, Segovia and Connecticut State Trooper Martin Martinez, acting undercover, agreed to purchase 62½ grams of cocaine from Aguilar for $2,000. Aguilar said he would send a runner to deliver the cocaine. Thereafter, Segovia and Martinez were met by Sanchez at a location chosen by Aguilar; Sanchez delivered the 62½ grams of cocaine in return for the $2,000.

On January 30, 1990, Segovia and Martinez paged Aguilar, who promptly returned their call. They told Aguilar they wished to buy 125 grams of cocaine. A few minutes later, they again paged Aguilar; this time they received a return call from Cotto, who said Aguilar had put the call through to her. Cotto told them the cocaine was available for $4,000 and made arrangements for delivery. The sale was consummated that evening as planned.

On February 28, 1990, Martinez had a series of conversations with Aguilar, Cotto,

and Morales. Aguilar told Martinez that the organization had replenished its cocaine supply and that he was holding 125 grams for Martinez. Cotto thereafter informed Martinez that she had the 125–gram package and that the price was $4,500. Morales then called Martinez and arranged for the delivery, which was made early that evening.

In June 1990, confidential informant Vickie Vega introduced Connecticut State Trooper Leslie Norcia, acting undercover, to Aguilar. On June 15, 1990, Vega, under Norcia's direction, negotiated with Boero for the delivery of 1½ ounces of cocaine. The packages were delivered by one of Aguilar's associates that day.

In July 1990, DEA Special Agent Grayling Williams posed as one of Segovia's customers, and Segovia introduced him to Aguilar. Aguilar agreed to sell him one kilogram of cocaine for $31,000. The sale was made on July 16.

On October 24, 1990, arrest and search warrants for the Aguilar group were authorized. On that day, Williams telephoned Aguilar, who agreed to sell Williams one kilogram of cocaine for $30,000 the following day. Upon Aguilar's arrival at the designated location the next day, he was arrested. From Aguilar's car, agents recovered his beeper, coded for the number used by agents to contact him during the investigation, and a package containing 1,001 grams of 96% pure cocaine. Executing the search warrants, agents seized numerous items from the apartment used by the Aguilar organization to package its cocaine, including eight bottles of cocaine diluents, seven scales for weighing cocaine, thousands of plastic baggies, a heat sealer used in packaging, and cocaine packaged in a style characteristic of that used by the Aguilar organization.

In light of this and other evidence to support the charges that Aguilar conspired to and did distribute cocaine and engaged in a continuing criminal enterprise, we conclude that the admission against him of the Tracy-threat annotations was harmless beyond a reasonable doubt.

### C. The Trial Judge's Geaney Explanation to the Jury

■ Aguilar also contends that the court improperly influenced the jury by disclosing to it the fact and content of the court's *Geaney* findings, *see United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). As discussed in Part II.B.2. above, statements that would otherwise be hearsay are admissible under Fed. R.Evid. 801(d)(2)(E) as statements of coconspirators only on the condition that a preponderance of the evidence establishes that a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy. Under the *Geaney* rule, statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those four prerequisites. *United States v. Geaney,* 417 F.2d at 1120; *see also Bourjaily v. United States,* 483 U.S. at 179 & n. 2, 107 S.Ct. at 2780 & n. 2 (in determining whether there is sufficient evidence to show that the declarant was a coconspirator of the defendant, trial court may consider the hearsay statements themselves).

■ The decision as to whether the four prerequisites have been met, like all other preliminary questions of admissibility, *see* Fed.R.Evid. 104(a), is to be made by the court. *Bourjaily v. United States,* 483 U.S. at 181, 107 S.Ct. at 2781. If the government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy of which both the declarant and the defendant were members, the statements are allowed to go to the jury. If the court is not so persuaded, it either should instruct the jury to disregard the statements, or, if those statements were "so large a proportion of the proof as to render a cautionary instruction of doubtful utility," should declare a mistrial. *United States v. Geaney,* 417 F.2d at 1120.

■ In the present case, having in mind his duty to decide these preliminary questions of admissibility, the trial judge told the

jury shortly after the start of trial, "we'll get to the point eventually where I will be telling you if the government proves a conspiracy." (Nov. 18 Tr. 65.) The judge also gave the jury a lengthy explanation of the *Geaney* rule, stating that he was allowing certain statements to be testified to "subject to connection" (Nov. 18 Tr. 73), explaining that he meant that "if the magic moment comes and the government's able to prove the conspiracy" (*id.*), he would inform the jury that the necessary connection had been established and that the jury could consider the statements:

if I find that the government has proved to my satisfaction the existence of a conspiracy and that this gentleman, Mr. Aguilar, was a member of the conspiracy, then the government has done the connection and I will tell you that all this evidence is admitted against Mr. Aguilar.

(*Id.*) At the close of the evidence, the judge informed the jury that "the magic moment ha[d] arrived" (Dec. 20 Tr. 47) and that he had determined that all of the statements attributed to either defendant, or indeed to any coconspirator, could be used against both defendants.

We agree with Aguilar that the court's statements were inappropriate. We recognize that a trial judge, in making any ruling that proffered testimony is only conditionally admissible, may well alert the jury that there may be a later ruling that the jury is not to consider this evidence after all; and we recognize that, if the judge has so alerted the jury, his eventual instruction that the jury is permitted to consider the evidence will inevitably inform the jury that the preconditions to admission have been met to the judge's satisfaction. We can see no need, however, to instruct the jury as to what facts the judge himself must find in order to rule on admissibility. And there is every need for the judge not to couch his rulings in terms that may unduly influence the jury. Thus, where, as is generally true in a *Geaney* situation, the preconditions to admissibility include elements of the offenses with which the defendants are charged, disclosure to the jury that the government has established those elements to the satisfaction of the judge is

especially inappropriate. When the government has persuaded the judge that the prerequisites for admission of coconspirator statements have been established, the judge should make his *Geaney* findings outside the presence of the jury, and the jury should not be told what facts the judge believes have been established. *Accord United States v. Peters,* 791 F.2d 1270, 1285 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986); *United States v. Vinson,* 606 F.2d 149, 153 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). *See generally* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 104[5], at 104-56 to 104-63 (1987); *id.* at 104-63 ("When the judge decides admissibility, the jurors should not be told anything about the issue.").

Nonetheless, an inappropriate instruction of this nature does not automatically require reversal. *See generally United States v. Peters,* 791 F.2d at 1286 (finding no case in which an instruction of this type had been held to be reversible error). In reviewing a claim that the defendant was prejudiced by a *Geaney*-finding revelation to the jury, we will consider principally the degree to which the trial judge indicated to the jury that a conspiracy existed, whether the judge properly advised the jury as to its role in determining whether or not a conspiracy existed and as to the standard of proof the jury is to apply, whether the defendant objected to the *Geaney*-finding revelation, and the strength of the government's proof on the conspiracy issues. *See, e.g., United States v. Peters,* 791 F.2d at 1286.

Consideration of these factors in the present case leads us to conclude that the trial judge's *Geaney* statements are not grounds for reversal. The express statements that the judge would make a finding as to whether there was a conspiracy were made shortly after the start of the trial. Neither Aguilar nor counsel for Tracy, whom the judge's statements affected equally, objected. The judge accompanied those statements with an instruction that his would be merely an evidentiary finding and that it would remain the responsibility of the jury to determine whether or not the defendants were guilty.

The instruction that it was the responsibility of the jury, not the judge, to determine guilt was reiterated at the close of the evidence. In addition, in informing the jury at that time that the government had made the "connection" required to allow the jury to consider the statements of one coconspirator against another, the judge explained in detail the nature of his own role, stating that his determination had been made on the basis of a preponderance of the evidence, whereas the jury could find the defendants guilty only if it found that the government had proven its case beyond a reasonable doubt. In general, we do not approve of instructing the jury in a criminal case with respect to the contours of the preponderance-of-the-evidence standard used by the court to make its admissibility rulings, for it is difficult enough to educate the jury as to the one standard of proof that it must apply in determining the matter of guilt without risking confusing it by explaining a different standard that does not apply. However, since there is no indication that the judge's explanation of the preponderance standard caused any jury confusion, we view it as an explanation that served in this case to mitigate the inappropriateness of the early statements that the judge himself would make a finding as to whether or not there was a conspiracy.

Finally, as discussed in Part II.B.2. above, the government introduced abundant non-hearsay evidence of the existence of the conspiracy and of defendants' membership in it, including Aguilar's own statements, the observed conduct of the codefendants, the drug transaction records, and the testimony of coconspirators Boero and Sanchez. We conclude that, in all the circumstances, the error of the trial judge in advising the jury that he would make an evidentiary finding as to the existence of a conspiracy was beyond a reasonable doubt harmless.

### D. Other Contentions

Aguilar also contends that the court erred in allowing government witnesses to testify to hearsay and in explaining to the jury the relevance of various pieces of government evidence. These contentions need not detain us long.

Most of the testimony challenged as hearsay was given by investigating agents, describing information received from informants during the course of the government's 1½–year investigation. The testimony was received as background information with respect to that investigation, and we see no abuse of discretion in its admission. *See United States v. Lubrano*, 529 F.2d 633, 636 (2d Cir.1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976); Fed.R.Evid. 801.

As to the court's explanations to the jury of the relevance of certain evidence offered by the government, although they exceeded the commentary that is usually found in such a trial, we suspect that the court was making an effort to explain that relevance to Aguilar, who was proceeding *pro se*. Even if the court's commentary was inappropriate, the relevant inquiry on appeal is "whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial," *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985), and the defendant's burden on that question is substantial, *see, e.g., United States v. Mickens*, 926 F.2d 1323, 1327–28 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); *United States v. Bejasa*, 904 F.2d 137, 144 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990). Here, in commenting on the evidence, the court took care to instruct the jury that interpreting and weighing the evidence was "entirely up to [the jury]," and that the court's own comments did not bespeak a belief or disbelief in the testimony of a particular witness.

In sum, viewing the record in its entirety, we cannot conclude that Aguilar has sustained his burden of showing that either any improvident admission of hearsay or the explanatory comments of the court denied him a fair trial.

### E. Challenges to Sentencing

Defendants contend that the court erred in calculating their respective sentences under the Guidelines. Tracy contends that the court also erred in imposing his sentence for the present offense consecutively to his 1991

sentence. Only the last of these contentions has merit.

### 1. *Aguilar's Sentencing Challenge*

■ The prescribed Guidelines range for Aguilar was 360 months to life imprisonment. As required by the Sentencing Reform Act, Tit. II, Comprehensive Crime Control Act of 1984, 18 U.S.C. § 3551 *et seq.* (1988), the district court stated its reasons for sentencing Aguilar to 480 months. *See id.* § 3553(c) (where applicable Guidelines range exceeds 24 months, court must explain its selection of point within the range). Isolating one part of the court's statement, Aguilar claims that the court's selection of a sentence 120 months above the bottom of the guideline range was meant to punish him for exercising his right to go trial. We disagree.

The part of the court's explanation to which Aguilar points stated that Aguilar

> not only minimizes his role in this operation, but negates it. In other words, he claims there was really nothing going on here and that he has been unjustly and unfairly and illegally prosecuted by the government in violation of his constitutional rights.

(Aguilar Sentencing Transcript, June 26, 1992, at 56.) We see in this statement nothing to indicate that the court sought to penalize Aguilar for exercising his right to put the government to its proof. Further, the court stated several other weighty reasons for the sentence it selected, including the evidence that Aguilar was "the leader of a very large sophisticated drug organization," that he was "the decision maker in every facet of the business," that he was "connected with every aspect of the operation," and that the organization used violence. (*Id.* 55–56.) Accordingly, we reject the contention that, in selecting the sentence to be imposed on Aguilar, the court relied on any impermissible factor.

### 2. *Tracy's Challenges to the Calculation of His Sentence*

■ Tracy challenges the court's calculation of his sentence with respect to (a) the amount of cocaine pertinent to his base offense level, (b) his role in the offense, and (c) his use of a firearm in connection with the

conspiracy. Facts in connection with sentencing must be established by a preponderance of the evidence, *see, e.g., United States v. Pirre,* 927 F.2d 694, 696 (2d Cir.1991) (quantity of narcotics); *United States v. Campuzano,* 905 F.2d 677, 680 (2d Cir.) (same), *cert. denied,* 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990); *United States v. Garcia,* 920 F.2d 153, 156 (2d Cir.1990) (per curiam) (role in offense); *United States v. Rios,* 893 F.2d 479, 481 (2d Cir.1990) (same), and we must "accept the findings of fact of the district court unless they are clearly erroneous," 18 U.S.C. § 3742(e) (1988). Given these principles, Tracy's challenges to the calculation of his sentence do not require extended discussion.

■ The PSR calculated that Tracy was responsible for 5–15 kilograms of cocaine. Tracy disputed this, stating that because his salary was only $800 a week, he could not envision that the conspiracy dealt in such a large quantity of narcotics. The court properly rejected this contention. The evidence of Tracy's extensive participation in the conspiracy included the trial testimony of Sanchez that Tracy had delivered to her 1–1½ kilograms of cocaine once or twice a week for several months; the sentencing hearing testimony of Bissam Bittar, a cocaine deliverer for the organization, that, dating back to 1986 or 1987, Tracy had made or accompanied all deliveries to Bittar of more than one pound of cocaine; and the testimony of several witnesses that Tracy had provided protection to the organization and collected its drug debts, demonstrating his familiarity with the scope of the organization. The evidence was thus ample to support the court's finding that the conspiracy's dealing in at least 5–15 kilograms of cocaine was foreseeable to Tracy.

■ Tracy also contended that he played a minor role in the conspiracy and hence was entitled to a two-step reduction in his offense level; he contends that the district court did not rule on this contention. We reject both contentions. The PSR for Tracy recommended an increase in offense level on account of his role as a supervisor. Tracy's attorney argued against this recommendation and in favor of a downward adjustment on

the ground that Tracy's role was minor. Immediately after hearing this argument, the court stated that it was well aware of the dimension of Tracy's involvement, both from the proceedings against Tracy and Aguilar and from evidence presented at the related trial of Samuel Segarra, *see, e.g., United States v. Carmona,* 873 F.2d 569, 574 (2d Cir.1989) (sentencing court is entitled to rely on any type of information known to it, including testimony from a trial in which person to be sentenced was neither a defendant nor represented by counsel). That evidence included the testimony of indicted coconspirator Ingrid Aguilar, Aguilar's wife, at the sentencing hearing held for Tracy, that Tracy had served as Aguilar's chief of security for some 10 years, and that in that capacity Tracy had supervised four or five people at a time, through several changes of security personnel over the years (Tracy Sentencing Transcript, May 22, 1992 ("Tracy S. Tr."), at 59); and the testimony of Boero at the trial of Tracy and Aguilar that Tracy "was in charge of all the soldiers" (Trial Transcript, December 4, 1991, at 136). The court found that although Tracy was not as culpable as Aguilar, he was "an important supervisor" in the organization, and that there were "an awful lot of people"—at least six according to the evidence heard by the court at this and the Segarra trial—"who were under the supervision of the defendant Tracy." (Tracy S. Tr. 169.) Accordingly, it ruled that Tracy's role in the operation warranted an increase in his offense level. Though the court did not state explicitly that Tracy was not a minor participant, such a ruling was plainly implicit in its finding that he was "an important supervisor"—a view that foreclosed any possible finding that his role was minor.

■■■ As to the upward adjustment of Tracy's offense level for possession of a weapon, the pertinent guideline requires such an increase "[i]f a dangerous weapon (including a firearm) was possessed during the commission of the offense." Guidelines § 2D1.1(b)(1). Commentary to this section explains that

> [t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.

The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

Guidelines § 2D1.1(b)(1), Application Note 3. The court's finding that this provision was applicable to Tracy was supported by, *inter alia,* Ingrid Aguilar's testimony that she had seen Tracy carrying a gun at Aguilar's fruit store, from which the narcotics operation was run; and by Bittar's testimony that he had seen Tracy carrying a gun more than a dozen times, that Tracy habitually wore a long black leather coat to conceal his guns, and that Tracy had threatened to shoot him if he cheated on the organization. Even if the court's finding that Tracy used a weapon were not thus supported, there would be no basis for relief since the court also noted that 327 months would be the upper end of the applicable sentencing range if the weapon possession enhancement did not apply, and indicated that its choice between the two ranges was therefore "academic" (Tracy S. Tr. 98). *See, e.g., United States v. Bermingham,* 855 F.2d 925, 931 (2d Cir.1988) (where sentencing court resolves disputed issue by sentencing defendant within overlap of two possible Guidelines ranges, disputed issue provides no basis for reversal).

### 3. *The Imposition of a Consecutive Sentence on Tracy*

■■■ Prior to his conviction of conspiracy in the present case, Tracy was convicted, because of the threats he noted on the Complaint, of threatening a federal officer and his family, in violation of 18 U.S.C. § 115(a)(1). He was sentenced under the Sentencing Reform Act to a total of ten years' imprisonment for those offenses. That sentence, imposed in May 1991, had not been discharged before imposition of his sentence for the present offense.

Sentencing Guideline § 5G1.3, which governs the imposition of a sentence upon a defendant who has an undischarged term of imprisonment, provides as follows:

(a) If the instant offense was committed while the defendant was serving a term of imprisonment ... or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

(b) If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that constituted part of the same course of conduct as the instant offense and have been fully taken into account in the determination of the offense level of the instant offense, *or if the prior undischarged term of imprisonment resulted from a federal offense and was imposed pursuant to the Sentencing Reform Act,* the sentence for the instant offense *shall be imposed to result in a combined sentence equal to the total punishment that would have been imposed under § 5G1.2 (Sentencing on Multiple Counts of Conviction) had all the sentences been imposed at the same time.*

(c) In any *other* case, the sentence for the instant offense shall be imposed to run consecutively to the prior unexpired term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.

Guidelines § 5G1.3 (emphasis added). Section 5G1.2 requires calculation of a sentence in accordance with the grouping-of-offenses analysis set forth in Chapter Three, Part D, of the Guidelines ("Multiple Counts").

In imposing sentence on Tracy, the district court ruled that the present sentence should be imposed consecutively under § 5G1.3(c):

... Turning to 5g1.3c, and I want to make this very clear as to how the court is ruling on this—5g1.3 is the imposition of a sentence on a defendant subject to an undischarged term of i[m]prisonment. Subsections A and B, in the judgment of the court do not apply to this situation for reasons that are rather evident when you read the text of those subsections.

The subsection that does apply, therefore, is subsection C....

(Tracy S. Tr. 100.)

The inapplicability of the latter part of subsection (b) is not evident to us. It is plain that subsection (a) did not apply, because Tracy did not engage in the conspiracy either while he was serving a term of imprisonment for his threats or after he had been sentenced for making those threats. Since (a) did not apply, subsection (b), by its terms, required that the sentence be imposed in accordance with § 5G1.2 if the prior undischarged term of imprisonment "resulted from a federal offense and was imposed pursuant to the Sentencing Reform Act." Since Tracy's undischarged sentence was for a federal offense for which he was sentenced under that Act, subsection (b), not subsection (c), applied. Thus, the court should have calculated the sentence prescribed by the Guidelines as if Tracy were being sentenced on all three of his federal offenses at one time, calculating his total pursuant to § 5G1.2.

Accordingly, we vacate Tracy's sentence and remand for resentencing.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and, except to the extent indicated above, have found them to be without merit. The judgment as to Tracy is vacated and the matter is remanded for the imposition of sentence in accordance with the foregoing. In all other respects, the judgments are affirmed.